**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0916n.06
Filed: December 20, 2006

**No. 06-1251**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **SHARON BURKE-JOHNSON**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **DEPARTMENT OF VETERANS AFFAIRS,** | ) | **O P I N I O N** |
| **ANTHONY J. PRINCIPI, SECRETARY**, | ) | |
| | ) | |
| *Defendant-Appellee*. | ) | |

BEFORE:    KENNEDY, COLE, COOK, Circuit Judges.

   **R. GUY COLE, JR., Circuit Judge.** Plaintiff-Appellant Sharon Burke-Johnson brought

a Title VII action against her employer, the Secretary of the Department of Veterans Affairs (the

"Secretary"), alleging that she was denied a promotion at the Department's Ann Arbor, Michigan

Medical Center ("Ann Arbor VA") due to her race. The district court granted summary judgment

for the Secretary, ruling that Burke-Johnson failed to adduce sufficient evidence from which a

reasonable factfinder could conclude that the Secretary's proffered reasons for denying Burke-

Johnson a promotion were pretextual. For the reasons that follow, we **AFFIRM** the judgment of

the district court.

**I. BACKGROUND**

   Sharon Burke-Johnson is an African-American woman who has worked at the Ann Arbor

VA since 1981. Burke-Johnson started out as a GS-4-level ward clerk but, by 1992, she had climbed to a GS-6-level position as a supervisory medical clerk. In 1996, Burke-Johnson applied for and received one of four positions as an Administrative Information Coordinator ("AIC"), a GS-7-grade position. The other persons selected to be AICs included two Caucasian women, Martha Morgan and Nancy Werkema, and one Hispanic woman, Luisa Cardona. When Morgan left the Ann Arbor VA to assume a position in a different department of the VA, she was replaced by a Caucasian woman named Susan Varcie, a.k.a. Susan Fleece.

As originally conceived, the AICs worked for the clinical coordinators (essentially head nurses) in the individual units of the Ann Arbor VA, and their jobs were to support the unit and its clinical coordinator. Between 1996 and 1998, Burke-Johnson worked as an AIC in the psychiatry continuum and the cardiology continuum. In 1999, she was reassigned to work for Pamela McCoy, a clinical coordinator responsible for managing various clinical specialists and the Ann Arbor VA's quality-assurance program. Burke-Johnson's second-line supervisor throughout her tenure as an AIC was Jo Tirone, a Caucasian woman who was the Ann Arbor facility's chief nurse.

Burke-Johnson worked as an AIC under McCoy for approximately three years. During this time, her principal responsibilities included gathering patient-care and other types of data and organizing it into reports. McCoy gave Burke-Johnson positive performance evaluations and characterized her as an "excellent employee[]." At her deposition, McCoy further testified that Burke-Johnson's strengths as an employee included her ability to effectively report the data she gathered in a spreadsheet format of her own design, as well as her prior experience and knowledge of the VA system.

The VA underwent a reorganization beginning in 1998 that resulted in the dissolution of certain departments and positions within the Ann Arbor facility. As part of this process, Tirone slated the AIC positions for elimination. Over time, Tirone reassigned Burke-Johnson's AIC colleagues to new duties within the Ann Arbor VA. For instance, Tirone reassigned Werkema to a position as Tirone's own secretary, and when Werkema left the VA, Tirone assigned Cardona to that post. Varcie was reassigned to a public-affairs position within the VA. Thus, by 2001, Burke-Johnson was the only remaining AIC.

In February 2001, Burke-Johnson applied for a promotion to the position of Staff Assistant, a GS-9-grade appointment. Cardona and one other person also applied. A panel consisting of Tirone, a woman named Jannette Ventura (the first-line supervisor to the Staff Assistant), and a third unidentified person, reviewed the applications and made the promotion decision. The Staff Assistant's duties primarily involved inputting staffing data (such as staffing needs and effectiveness and information regarding promotions, awards, overtime, and sick leave) into computer models to generate reports. Thus, the position required proficiency in software applications, such as Excel, Outlook, and internal VA programs. Tirone testified that although computer skills were an important requirement for the job, she regarded knowledge of the VA's overall patient-care service, organizational skills, decision-making skills, and interpersonal skills as being "higher on the list" of important qualifications.

After an informal review process, Tirone and her colleagues chose Cardona to fill the Staff Assistant job. At the time of her selection, Cardona had been working as Tirone's secretary for more than a year. Partly owing to her observations of Cardona as her secretary, Tirone testified that

Cardona's decision-making skills, organizational skills, knowledge of the VA's overall service, and interpersonal skills were superior to Burke-Johnson's. In addition, Tirone concluded that Cardona possessed all of the necessary computer skills to perform the job. Tirone testified that she did "[n]ot really" observe Burke-Johnson's performance as an AIC (when Tirone was Burke-Johnson's second-line supervisor), that she rarely interacted with Burke-Johnson, and that her knowledge of Burke-Johnson's job qualifications consisted of a "baseline understanding." However, Tirone viewed Burke-Johnson's interpersonal skills as "problematic," testifying that "Sharon is often defensive, she's aloof among her peers, these are observations that I've made and my attempt to communicate with her in just simple ways, saying hello, she's abrupt. She's abrupt, not just with me but others, that was taken into consideration when I selected Luisa [Cardona] over Sharon for the position." JA 326. In contrast, Tirone felt that Cardona's "interpersonal skills go beyond just a small group of people and to the entire service and people outside of patient care," that Cardona had developed "a cadre of relationships that made her knowledgeable beyond clinical issues or unit-specific patient-care issues," and that Cardona's "realm of interactions with other people in the medical center" was broader than Burke-Johnson's. *Id.* 326-27, 328.

McCoy testified that she was not surprised by Burke-Johnson's lack of success in obtaining a promotion because as she "look[ed] back on that time period [she] did not, to my knowledge, see African-Americans being promoted."[1] Asked about whether she felt that racial discrimination could

---

[1]Burke-Johnson alleges that she applied for, and was denied, at least thirty promotions at the Ann Arbor VA. The only promotion at issue in this appeal, however, is that involving the Staff Assistant position.

have played a role in Burke-Johnson's inability to get promoted, McCoy responded, "[y]es, I did."

McCoy further testified as follows:

> Q: In your own words right now today looking back, your memory, your honest memory, is Jo Tirone someone who engaged in racial discrimination?
>
> A: At that time, yes.
>
> Q: When you would discuss Sharon Burke-Johnson with Jo Tirone, did Jo Tirone ever make statements that you felt were demeaning or hostile or depriving Ms. Burke-Johnson of her dignity outside of her presence?
>
> A: Yes.
>
> Q: Could you describe them, please?
>
> A: I can't remember specifics but from what you've just stated, that was the general outcome of some of the conversations.
>
> Q: It was the tenor, the feeling you received of her attitude towards Ms. Burke-Johnson?
>
> A: Yes.

JA 505-506.

Burke-Johnson continued to work as an AIC until May 5, 2002, when she was laterally reassigned to a program-support-assistant position in the ambulatory-care unit. After filing a complaint with the EEOC and obtaining an unfavorable adjudication there, Burke-Johnson brought suit in the Eastern District of Michigan on October 19, 2004. She asserted a Title VII claim for race discrimination for the failure to promote her to numerous positions, including the Staff Assistant position, and for retaliation in response to her filing an EEOC complaint. The Secretary brought a

motion for summary judgment, arguing, among other things, that Burke-Johnson could not establish

that she was denied the Staff Assistant job due to her race. In opposing the motion, Burke-Johnson

abandoned her retaliation claim. The district court granted summary judgment, concluding that

Burke-Johnson had not presented either direct or circumstantial evidence sufficient to create a

genuine issue of material fact as to whether the Secretary's asserted rationale for selecting Cardona,

rather than Burke-Johnson, was a pretext for unlawful discrimination. Burke-Johnson timely

appealed.

## II. DISCUSSION

### A. Standard of Review

This Court reviews a district court's grant of summary judgment de novo, employing the

same standard as the district court. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). Summary

judgment is appropriate where the record shows that "there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The

movant has the burden of proving the absence of any genuine issues of material fact. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325 (1986). In response, the nonmoving party must present "significant

probative evidence" to show that "there is [more than] some metaphysical doubt as to the material

facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). In determining whether the

movant has met his burden, the Court views the evidence in the light most favorable to the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Title VII Standards

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial

evidence to prevail on her Title VII race-discrimination claim. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

Direct evidence is evidence that is free of inferences and that, if believed, requires a finding that "unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006); *compare Reeves v. Swift Transp. Co.,* 446 F.3d 637, 640-41 (6th Cir. 2006) (the defendant's light-duty policy was not direct evidence of pregnancy discrimination because the express terms of the policy were pregnancy-blind) *with Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1249 (6th Cir. 1995) (affidavits by plaintiff and witnesses setting forth racist comments made by restaurant owners constituted direct evidence of discrimination).

Under the circumstantial-evidence approach, a plaintiff must "show[] the existence of facts which create an inference of discrimination." *Talley*, 61 F.3d at 1248. This method of proof "'arose out of the Supreme Court's recognition that direct evidence of an employer's motivation will often be unavailable or difficult to acquire.'" *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 436 (6th Cir. 2002) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996)). The familiar *McDonnell Douglas/Burdine* burden-shifting framework applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *DiCarlo*, 358 F.3d at 414. First, the plaintiff must make out a prima facie case of racial discrimination.[2] *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000).

---

[2]To make out a prima facie case of race discrimination based on a failure to promote, a plaintiff must show: (1) she is a member of a protected class; (2) she applied for and was qualified for the promotion; (3) she was considered for and denied the promotion; and (4) another employee of similar qualifications who was not a member of the protected class received

"After a plaintiff creates a presumption of discrimination by establishing a prima facie case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision." *Id.* at 1021. If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. *Id.*; *DiCarlo*, 358 F.3d at 414-15. Throughout this burden-shifting process, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *DiCarlo*, 358 F.3d at 415 (internal citation omitted).

A plaintiff may establish that a defendant's stated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) is insufficient to explain the challenged conduct. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

## C.     Burke-Johnson's Evidence of Pretext

The Secretary does not dispute that Burke-Johnson has established a prima facie case of race discrimination. Instead, the Secretary argues that it has set forth a legitimate, non-discriminatory reason for the selection of Cardona for the Staff Assistant position, namely, that Cardona was better qualified in that she possessed decision-making, organizational, and interpersonal skills that were superior to Burke-Johnson's, as well as a greater breadth of experience within the VA. Burke-Johnson challenges the Secretary's rationale as pretextual on the grounds that, under *Manzer*, it did not actually motivate the Secretary's conduct. Burke-Johnson relies on McCoy's testimony, and

the promotion. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006).

further argues that her qualifications exceeded Cardona's, and that the selection process for the Staff Assistant job was illegitimate. Although she proceeds under both the circumstantial and direct methods of proof, Burke-Johnson cannot withstand summary judgment under either one.

    1.    <u>Circumstantial-Evidence Approach</u>

    (a)    *McCoy's Testimony*

Burke-Johnson argues that McCoy's testimony is sufficient to create an inference that Tirone was motivated by race discrimination in her selection of Cardona over Burke-Johnson. As an initial matter, McCoy testified that she was not involved in the hiring process for the Staff Assistant position, that she did not know what duties were encompassed by that position, and that she had no basis for comparing Burke-Johnson's job performance with Cardona's. By her own admission, then, McCoy is not equipped to opine on whether Cardona was better qualified to assume the Staff Assistant position.

Burke-Johnson relies primarily on three statements that McCoy made at her deposition that, according to Burke-Johnson, give rise to a question of fact about the legitimacy of the Secretary's proffered reasons for preferring Cardona.

First, Burke-Johnson points to McCoy's testimony wherein McCoy agreed with the statement that "race discrimination may have played a role in [Burke-Johnson's] failure to achieve a promotion." JA 426. Although it generally supports Burke-Johnson's argument, this testimony is insufficient to submit Burke-Johnson's claims to a jury because McCoy did not tie her view to Burke-Johnson's failure to gain the Staff Assistant promotion, but only to Burke-Johnson's general inability to get promoted. Where Burke-Johnson testified that she has applied and been turned down

for more than thirty promotions at the Ann Arbor VA, McCoy's testimony is not sufficient to raise a genuine question of fact as to whether race discrimination was a motivating factor in the selection process for the particular position on which Burke-Johnson predicates her Title VII claim.

Second, Burke-Johnson cites to McCoy's affirmative response to a question about whether Tirone engaged in racial discrimination:

> Q: In your own words right now today looking back, your memory, your honest memory, is Jo Tirone someone who engaged in racial discrimination?
>
> A: At that time, yes.

JA 505.

McCoy's "[a]t that time" reference was to February-May 2000 when McCoy alleged in her own EEOC complaint that she was subjected to racial discrimination by her superiors at the Ann Arbor VA. Burke-Johnson contends that McCoy's testimony carries considerable weight because McCoy directly supervised Burke-Johnson and reported to Tirone on Burke-Johnson's work activities and performance. In addition, McCoy asserted that she suffered racially discriminatory treatment at the hands of Tirone not long before Tirone allegedly discriminated against Burke-Johnson (Burke-Johnson was denied the Staff Assistant job in February 2001).

Read as an isolated exchange, McCoy's testimony that Burke-Johnson behaved in a racially discriminatory way "[a]t that time" might preclude summary judgment for the Secretary. After all, if the trier of fact believed McCoy's testimony that Tirone discriminated against African-American employees around the time in which Burke-Johnson was denied the Staff Assistant promotion, it would not be a far leap to conclude that Tirone rejected Burke-Johnson on the basis of Burke-

Johnson's race.

Despite its probative value, McCoy's testimony does not enable Burke-Johnson to withstand summary judgment because McCoy limited her opinion that Tirone engaged in racial discrimination to her—i.e., McCoy's—own experiences at the Ann Arbor VA that prompted McCoy to file her own EEOC complaint. At least four times during her deposition, McCoy testified that she could only speak to her own experience. In fact, in a deposition question which just preceded that excerpted above, McCoy was asked whether "Tirone treated blacks and whites differently from each other." McCoy answered, "I can only speak to my own situation at that time and that is what the record reflects for that time." JA 505. Thus, viewed in context, McCoy's testimony that Tirone engaged in racial discrimination "[a]t that time" is of minimal help to Burke-Johnson because McCoy confined her opinion to her "own situation" at the Ann Arbor VA. In other words, McCoy's testimony does not give rise to an inference that Tirone discriminated against Burke-Johnson, or that Tirone discriminated generally against African-Americans. Even if true, McCoy's testimony that Tirone discriminated against her cannot stand in as proof of a discriminatory animus towards Burke-Johnson.

Third, Burke-Johnson notes that McCoy agreed that Tirone made comments that were "demeaning" or "hostile" to Burke-Johnson, or that tended to "deprive[] Ms. Burke-Johnson of her dignity." JA 506. However, McCoy was not able to offer any examples. All McCoy was able to say was that these types of derisive remarks were "the general outcome" of her conversations with Tirone. *Id.* This is insufficient. *See Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 171 (6th Cir. 1996) (affirming the district court's grant of summary judgment where the plaintiffs' evidence

contained numerous allegations of disparate treatment "that [were] made in general, conclusory terms, but names, times and occasions [were] missing" and the affidavits were "filled with statements of the subjective beliefs of the affiants" that the defendant discriminated against its employees from Africa). More to the point, even assuming that Tirone did belittle Burke-Johnson, McCoy did not testify that these comments were based on Burke-Johnson's race.

What is left of McCoy's testimony then is her general view that African-Americans encounter stiffer resistance than whites to advancement at the Ann Arbor VA. Even if true, this is too slender a basis upon which a reasonable factfinder could conclude that Burke-Johnson was not promoted to the Staff Assistant position due to her race, rather than the non-discriminatory reasons proffered by the Secretary.

Burke-Johnson analogizes McCoy's testimony to that of witnesses in *Carter v. Univ. of Toledo*, 349 F.3d 269 (6th Cir. 2003) and *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427 (6th Cir. 2002) and argues that just as the *Carter* and *Hopson* witnesses' statements were sufficient to defeat the defendants' motions for summary judgment there, so is McCoy's testimony sufficient to defeat the Secretary's motion here. Contrary to Burke-Johnson's assertion, both cases are distinguishable.

In *Carter*, the plaintiff was an African-American visiting professor at the University of Toledo's College of Education during the 1999-2000 academic year. 349 F.3d at 271. When she had not heard whether her contract would be renewed for the following year, the plaintiff contacted the university's Vice Provost, who coordinated faculty hiring. *Id.* The plaintiff testified that the Vice Provost told her that the Interim Dean of the College of Education was "trying to whitewash the College of Education and I am not going to let her do this," that the Interim Dean "was trying

to get rid of the black professors and that he was in a struggle with her involving the appointment of an additional black professor," and that the personnel within the College of Education "were a bunch of racists." *Id.* at 272. This Court reversed the district court's grant of summary judgment, holding that "if the jury were to believe that [the Vice Provost] in fact made the remarks attributed to him, then they might find that the University's proffered reasons 'did not actually motivate the defendant's challenged conduct.'" *Id.* at 276.

The descriptive quality of the Vice Provost's comments contrasts sharply with McCoy's inability to provide any examples of Tirone's allegedly disparaging remarks about Burke-Johnson, but that alone does not distinguish *Carter* from this case. The Vice Provost in *Carter* broadly accused the Interim Dean of working to keep all African-Americans out of the College of Education, thus giving rise to an inference that the Interim Dean discriminated against the African-American plaintiff. McCoy, on the other hand, testified only about her "own situation" and did not testify that Tirone systematically discriminated against African-Americans at the Ann Arbor VA.

*Hopson* is also unavailing. There, the plaintiff was a long-time DaimlerChrysler employee who applied for, but was denied, five different promotions for which DaimlerChrysler conceded he was qualified. 306 F.3d at 429. The plaintiff's supervisor testified that, in his opinion, the plaintiff's race was a motivating factor in the company's refusal to promote him. *Id.* at 431. This Court treated the supervisor's testimony as circumstantial evidence of discrimination because the supervisor was familiar with the company's hiring practices and the plaintiff's job strengths and therefore, "[i]n light of this knowledge, [the supervisor] was no doubt able to form a competent opinion regarding why [the plaintiff] was passed over for certain jobs." *Id.* at 433, 437.

If the evidence adduced by the plaintiff in *Hopson* was limited to the testimony of his supervisor, Burke-Johnson would be on firmer ground in arguing that McCoy's testimony is enough to defeat the Secretary's summary judgment motion. But the *Hopson* evidence was not so limited. The *Hopson* Court also was troubled by the defendant's proffered non-discriminatory reason—that in each of its non-promotion decisions involving the plaintiff, it had selected a better-qualified candidate—insofar as that reason "was vague, [and] failed to specify the manner in which the white employees were better qualified, or the degrees of difference in the [candidates'] annual evaluations." *Id.* at 436. The *Hopson* record also contained statistical evidence that African-Americans were under-represented in the positions to which the plaintiff was seeking a promotion. *Id.* at 437-38. The record compiled by Burke-Johnson is not so robust.

(b)      *Other Record Evidence of Pretext*

Besides McCoy's testimony, Burke-Johnson contends that there was other evidence that supports a finding of pretext. First, Burke-Johnson argues that the evidence does not show that Cardona was better qualified for the Staff Assistant position than her. She further claims that the process used to choose between the candidates for the Staff Assistant job was suspicious in that Tirone did not adequately investigate Burke-Johnson's qualifications.

The Secretary argues that Burke-Johnson has waived these arguments because she did not raise them in the district court. On reply, Burke-Johnson responds that these issues were encompassed by the proceedings below and that to the extent they were not, this Court should nonetheless consider them pursuant to *Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988), which held that an appellate court may exercise its discretion to

- 14 -

consider matters not raised below "to the extent the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress" of the litigation.

### i)      Qualifications Evidence

Although Burke-Johnson did not specifically discuss qualifications as evidence of pretext in her brief in opposition to the Secretary's motion for summary judgment, the question of her qualifications relative to those of Cardona was sufficiently part of the proceedings below. Burke-Johnson alleged her superior qualifications in her complaint, the Secretary sought to rebut that contention in its opening summary-judgment brief, and the district court considered and dismissed it as evidence of pretext in its order. Thus, we will address this argument.

In substance, Burke-Johnson claims that Tirone unduly emphasized "interpersonal skills" in the hiring process when it is not clear that interpersonal skills were an important qualification for a job that was primarily statistical in nature. Burke-Johnson further argues that the evidence does not show that her interpersonal skills are in fact lacking, and notes that until this litigation, Tirone signed McCoy's performance evaluations of Burke-Johnson and did not record that Burke-Johnson suffered from any interpersonal-skill deficiencies. Finally, Burke-Johnson appears to argue that the depth and breadth of her experience within the Ann Arbor VA was at least as extensive as Cardona's.

Burke-Johnson has not produced sufficient evidence to substantiate her qualifications argument. The Supreme Court has stated that "qualifications evidence may suffice, at least in some circumstances, to show pretext." *Ash v. Tyson Foods, Inc.*, 126 S. Ct. 1195, 1197 (2006). In *Bender v. Hecht's Department Stores*, 455 F.3d 612, 626 (6th Cir. 2006), this Court held that the probative value of qualifications evidence in terms of demonstrating pretext must be balanced against "the

- 15 -

principles that employers are generally 'free to choose among qualified candidates,' [quoting] *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987), and that '[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with,' [quoting] *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996)." Thus, "[w]hether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination." *Bender*, 455 F.3d at 626. If there is a dearth of other evidence of discrimination, then to survive summary judgment, "the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. *Id.* at 627.

Burke-Johnson has not met this standard. Even if it is true that her interpersonal skills were not lacking and that her experience within the VA was as well-rounded as Cardona's, these were just two of the factors that Tirone considered in the selection process. Tirone also pointed to the importance of overall knowledge of patient-care services, organizational skills, decision-making skills, and computer skills. Burke-Johnson has not shown that her skills in these other areas exceeded Cardona's, let alone, in light of the insufficiency of McCoy's testimony, that they so far surpassed Cardona's skills that Tirone's selection of Cardona was unreasonable.

Finally, although we recognize that "subjective reasons provide 'ready mechanisms for discrimination,'" Burke-Johnson has not adduced any evidence showing that Tirone did not actually regard excellent interpersonal skills as an important qualification for the Staff Assistant job. *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 461 (6th Cir. 2004) (internal citation omitted). Even had Burke-Johnson shown that interpersonal skills are irrelevant to the Staff Assistant's duties, she

could not defeat summary judgment because in a Title VII case "we look to the employer's motivation, not the applicant's perceptions, or even an objective assessment, of what qualifications are required for a particular position." *Wrenn*, 808 F.2d at 502. "[I]t is the employer's motivation and intent, not its business judgment, that is at issue." *Id.*

        *ii*)        *Selection-Process Evidence*

Without citing to any authority to support her position, Burke-Johnson argues that the selection process used by Tirone is indicative of discriminatory intent because Tirone lacked the necessary knowledge of Burke-Johnson's skills and experience to meaningfully consider her for the Staff Assistant position. Although this precise issue does not appear to have been raised in the district court, we will entertain it because the parties' briefing clearly frames the issue and no further factual development is required to dispose of it.

Burke-Johnson is correct that Tirone was unable to testify in-depth about Burke-Johnson's employment skills or performance within the VA, and the Secretary does not dispute that Tirone did not interview Burke-Johnson for the Staff Assistant position. Although it is conceivable that, in a proper case, a Title VII plaintiff might adduce evidence of pretext by showing that an employer's review of her application was so cursory as to suggest that an impermissible consideration might be at work, this is not such a case. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 340 (6th Cir. 1997) (noting that in the plaintiff's prior appeal, the Court reversed the grant of summary judgment and remanded to the district court "to determine whether TVA in fact made a good faith determination that [the candidate actually hired] was better qualified for the job"). It is undisputed that a panel consisting of Tirone, Ventura, and a third unidentified person reviewed the applications of the three

persons who applied for the Staff Assistant job. Moreover, Tirone had sufficient familiarity with Burke-Johnson's background and skills to be able to compare her with Cardona. Tirone testified that Burke-Johnson's scope of responsibility was not as broad as Cardona's and that Cardona had developed knowledge "beyond clinical issues or unit-specific patient-care issues" that made her the more desirable candidate. On this record, it cannot be said that the selection process gave short-shrift to Burke-Johnson's application, or that even if Tirone and her colleagues did fail to give adequate consideration to Burke-Johnson's skills, that that failure was based on Burke-Johnson's race.

2. Direct-Evidence Approach

Burke-Johnson contends that McCoy's testimony should be treated as direct evidence of discrimination. The district court properly rejected this argument.

In *Hopson* and *Carter*, this Court held that allegations of race discrimination made by persons who were not involved in the employment decision do not constitute direct evidence of discrimination. *Hopson*, 306 F.3d 433; *Carter*, 349 F.3d 273. Here, Burke-Johnson concedes that McCoy had no involvement whatsoever in the hiring process for the Staff Assistant position.

Second, even casting aside the "decision-maker" gloss to the direct-evidence test, Burke-Johnson ignores the well-entrenched principle that in Title VII cases, direct evidence "is evidence that proves the existence of a fact without requiring any inferences." *Grizzell*, 461 F.3d at 719. Here, where McCoy did not testify that Tirone engaged in racial discrimination in her non-selection of Burke-Johnson, inferences would surely have to be drawn from what McCoy did testify to—that Tirone discriminated against McCoy, that Tirone disparaged Burke-Johnson, and that African-Americans faced obstacles to advancement at the VA—to conclude that Burke-Johnson had been

denied the Staff Assistant job due to her race. The necessity of drawing inferences from McCoy's testimony disqualifies it as direct evidence.

Finally, Burke-Johnson contends that even if McCoy was not a decision-maker, this Court should extend the *Hopson*/*Carter* rule so that statements by "supervisor[s] in close contact with the decisionmakers," qualify as direct evidence. This argument is unavailing for the reasons described above: Whether evidence is "direct" turns on whether the factfinder would have to draw any inferences to conclude that a hiring decision was attributable to unlawful discrimination. Thus, there is no need for this Court to modify the *Hopson/Carter* rule because McCoy's testimony fails the threshold, i.e., "no inferences," determination of what qualifies as direct evidence.

## III. CONCLUSION

Because Burke-Johnson has not carried her evidentiary burden such that a jury could conclude that the Secretary's reasons for not promoting her to the Staff Assistant position are pretextual, we **AFFIRM** the judgment of the district court granting summary judgment for the Secretary.